## THE STATE v. WILLIAM LEE, Appellant.

Division Two, May 26, 1910.

1. **INFORMATION: Gambling Device: "Upon Which Dice Were Used."** An information charging, in the language of the statute, that defendant set up and kept "a certain table and gambling device commonly called a crap table, the same being then and there a gambling device, adapted, devised and designed for the purpose of playing games of chance for money and property," is not insufficient because it does not use the words "upon which dice were used." These words are not required by the statute.

2. ————: **On Divers Other Days.** The indictment is not bad because it charges that the offense of setting up a gambling device was committed on a certain day "and on divers other days and times prior thereto."

3. **GAMBLING DEVICE: Proof of Other Days.** The offense of setting up and keeping a gambling table and permitting persons to bet and play upon the same for money, is a continuous offense, and it is proper to permit the State to show the maintenance of the gambling table by defendant on other days and at other times and even months prior to the date named in the information, as establishing that it was maintained with defendant's knowledge and under his control on the date named. The case is not like those where each violation of the statute is a distinct offense.

4. **CROSS-EXAMINATION: Money for Being a Snitch.** Where the witness had candidly answered that he had been receiving money for some time for assisting police officers in detecting crap games, it was not reversible error to refuse to permit defendant's counsel on cross-examination to ask him if he had not received money "for being a snitch."

5. **GAMBLING DEVICE: Proprietorship: Installation of Telephone: Removal.** Testimony that defendant had a telephone installed in the room where the gambling device is charged to have been set up and that it had been removed more than a year before the date of the alleged offense, is of doubtful propriety, as tending to show the place was maintained by defendant; but as its removal, by the same token, tended to show he was not the proprietor thereafter, and in view of the other evidence in the case, it was not reversible error.

6. **INFORMATION: Nolle as to One Count: Motion to Elect.** Where the State enters a *nolle prosequi* as to one count, and the court so instructs the jury, the court did not err in failing to require the State to elect.

7. **VENUE: Proved Like any Other Fact: In City of St. Louis.** The question of venue is a question of fact and may always be proven like any other fact. And though no witnesses testified directly that the gambling table was set up in the city of St. Louis, yet where the record discloses that the prosecution was one in the circuit court in the city of St. Louis, that the defendant was charged with having set up and maintained the gambling device in said city, that the trial was had in said circuit court, that all the witnesses referred to the building as being on North Levee street, which they all understood to

State v. Lee.

be in St. Louis, and that the court required the jury to find that the offense was committed in the city of St. Louis, it will be held that the evidence was sufficient to justify the jury in finding the offense was committed in said city.

8. INFORMATION: Persons to the Grand Jury Unknown: Names of Gamblers. The defendant will not be discharged because the indictment averred that the defendant induced, enticed and permitted certain persons "whose names are to these grand jurors unknown, to bet and play at and upon a game," etc., where the evidence shows there were sixty-seven negroes in the room where the gambling device was kept at the time the raid was made, does not disclose the names of any of them, or when if at all their names were learned by the officers who made the raid, or that their names were known when the grand jury returned the indictment, but does disclose that the names of all witnesses before the grand jury were indorsed thereon, and that no one who took part in the gambling was a witness. Besides, the names of those who played upon the table were not an essential fact to be shown.

9. GAMBLING TABLE: Craps: Game of Chance: Proof. A craps table is a gambling device within the meaning of the statute; and though the one in evidence was once a pool table, testimony that a game was played thereon with dice, that bets were made upon it, and money lost and won, and that defendant received a per cent from the winners on the night the raid was made, is evidence that a game of chance was being played upon the table.

10. ———: Enticement: By Officer. Where the witness was given money by a police officer and told to go to defendant's place of business and start a game of craps, with the understanding that the officer with others would come in a half hour and raid the place, and the witness went there, but on his arrival the game was already under way and betting was going on and defendant was present and receiving five cents from each winner, and the witness did not start the game, but did play craps, the offense was complete without any reference to the action of the officers and the witness, and defendant cannot be discharged on the theory that by the enticement of the officer and the witness he was induced to violate the law.

11. ———: ———: Accomplice: Instruction. Nor was the witness an accomplice with the defendant in setting up a gambling table, and the court did not err in refusing to tell the jury he was.

12. ———: Verdict: Guilty as Charged. The verdict read: "We, the jury in the above-entitled cause, find the defendant guilty

State v. Lee.

of setting up gambling devices as charged in the indictment, and assess his punishment at two years in the State Penitentiary." *Held*, that the finding is that he was guilty as charged in the indictment, and the verdict is sufficient, and is not limited by the words "of setting up gambling devices."

Appeal from St. Louis City Circuit Court.—*Hon. Chas. C. Allen*, Judge.

AFFIRMED.

*C. Orrick Bishop* for appellant.

(1) The court erred in overruling appellant's demurrer to the indictment. The second count charged the defendants with setting up and keeping a certain table commonly called a crap table, etc., but failed to aver how or in what manner it was used. The approved indictments in the following cases, in each instance, alleged that the table in question was one "upon which dice were used," an averment omitted from this count, hence it was insufficient. State v. Rosenblatt, 185 Mo. 114; State v. Mathis, 206 Mo. 604; State v. McKee, 212 Mo. 138. The second count also alleged that defendants did the act charged, not only on the specific day mentioned, but also "on divers other days and times prior thereto," without fixing the period within which it was done. It might have been at a time barred by the statute; and at all events it gave defendant no clue as to when it was charged to have been done, and so left him in the dark as to what period he might have to defend. (2) The indictment charged that the defendants did the act upon the 20th day of December, 1907. The principal witness to sustain the charge, and the only witness who pretends to connect this appellant with the keeping of the alleged game, the negro, Fred Hutchinson, testified that on December 20, 1907, he was in the place alleged to be kept by the appellant; that at that time he saw, and participated in, a game of craps, where

appellant took off a nickel four or five times when a bet was won. Having thus made at least a prima-facie case under the indictment, and fixed the date as charged, it was error to admit testimony as to other times when a game was being played there, especially when the appellant was not shown to have been present at, nor to have participated in, nor to have had any control of, such alleged games. State v. Railroad, 219 Mo. 156. These other alleged games were far apart in point of time, were separate and distinct offenses, if committed at all, and inadmissible on any theory of proving intent or *scienter*. They could only serve to prejudice the jury. (3) The court erred in excluding testimony sought to be elicited by appellant from the negro witness Allen Smith. The crucial test of any witness is his cross-examination. A defendant has the right of a searching cross-examination, and to any evidence that may discredit a witness against him. It will not do to deprive one of this privilege who is on trial for his liberty. State v. Taylor, 118 Mo. 153. (4) The demurrer to the evidence should have been sustained. (a) There was no evidence from any witness that the buildings described as 410, 411 and 412 North Levee were in the city of St. Louis, nor that any games as described were played in the city of St. Louis; nor that any transaction detailed in the testimony occurred in the city of St. Louis. The record is challenged to show that the city of St. Louis was ever mentioned. Hence no venue was proven. (b) The indictment averred that the appellant induced, enticed and permitted certain persons "whose names are to these grand jurors unknown to bet and play at and upon a game played," etc. Whereas, it appears from the testimony that witnesses who testified at the trial as to alleged games played at appellant's "place," in which they claimed to have taken part, were before the grand jury as witnesses and testified there and gave their names; and that the

officer who led the so-called raids (Wells), and arrested parties there on the charge of playing as alleged, not only knew their names but actually secured warrants for a number of them, so that the grand jury actually knew and had the ready means of ascertaining who were induced, enticed and permitted, etc. If these facts were within the knowledge of the grand jury, or could have been ascertained by them by due inquiry, the averment that the names of the persons were unknown to them was untrue and a fraud upon the defendant, who is entitled to know who are his accusers, if that fact is known to the prosecution. State v. Stowe, 132 Mo. 199; State v. Thompson, 137 Mo. 620; State v. Wiseback, 139 Mo. 214. (c) There was no evidence that the game alleged to have been played was a game of chance. The mere calling of it "craps" did not make it craps nor a game of chance. (d) The testimony of Hutchison, which is the only testimony that connects the appellant with the alleged game as a keeper, and on the date named in the indictment, is such as should cause the court to take the case from the jury. No court should permit a defendant to be convicted when it appears, as in this case, that the officers of the law give money to a person with which to start a game in order that such officers may make an arrest. Such conduct cannot be too severely condemned. State v. Waghalter, 177 Mo. 676. (5) The verdict is insufficient to support a judgment. It reads "We, the jury, etc., find the defendant guilty of setting up gambling device, as charged in the indictment," etc. This verdict found appellant guilty of only a part of the charge, and that a part which, standing alone, constitutes no offense. It is no offense to set up a gambling device. State v DeWitt, 186 Mo. 61; State v. Cronin, 189 Mo. 663; State v. Miller, 189 Mo. 673; State v. Modlin, 197 Mo. 376.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) Appellant was convicted under the second count of the indictment. It follows the approved form set out in the case of State v. Lockett, 188 Mo. 418. The words, "upon which dice were used," are wholly surplusage and unnecessary. Every essential element of the statutory crime is charged in the second count under which appellant was convicted. It is true that similar words appear to have been used in the indictments or informations in the cases of State v. Rosenblatt, 185 Mo. 114; State v. Mathis, 206 Mo. 604 and State v. McKee, 212 Mo. 138, but in neither of those cases was the necessity of such words passed upon, nor the sufficiency of the indictment or information questioned. (2) The State is not required to prove the commission of the offense on the date alleged in the indictment, which in this case was December 20, 1907, or on any particular date; it may be shown that it was committed on any date prior to the filing of the indictment, and within the Statute of Limitations. State v. Palmberg, 199 Mo. 233; State v. Gift, 112 Mo. App. 200. (3) It is not necessary that the venue of a crime be proved by direct and positive evidence. It is sufficient if it can be reasonably inferred from the facts and circumstances as proved. State v. Shour, 196 Mo. 200. The testimony is undisputed that a crap game was going on at the time of the raid on December 20, 1907, the date alleged in the indictment. The proof shows that bets were being made on the crap game, and that was sufficient. State v. Mathis, 206 Mo. 604; State v. Rosenblatt, 185 Mo. 114; State v. Locket, 188 Mo. 415. (4) The verdict is a general one, and is not limited by the insertion of the words, "of setting up gambling device." The words, "as charged in the indictment," make the verdict a general one, and it should be so treated by this court on appeal. State v.

Bohle, 182 Mo. 67; State v. Court, 225 Mo. 609; State v. Smith, 190 Mo. 706; State v. McGee, 188 Mo. 401; Wallace v. State, 70 Tenn. 29.

GANTT, P. J.—On April 29, 1908, the grand jury for the city of St. Louis returned an indictment in two counts against the defendant. In the first count 'he is charged with having set up and kept gambling devices, to-wit, one poker table and one crap table, on December 20, 1907, at numbers 410, 411 and 412 North Levee street in the city of St. Louis, and the second count was in these words: "and the grand jurors aforesaid, upon their oath further present, that William Lee and Sam Favors on the twentieth day of December, one thousand nine hundred and seven, and on divers other days and times prior to and between that day and the day of the filing of this indictment, at the city of St. Louis and State of Missouri, did then and there willfully, unlawfully and feloniously set up and keep a certain table and gambling device commonly called a crap table, the same being then and on said other days and times there a gambling device, adapted, devised and designed for the purpose of playing games of chance for money and property; and did then and on said other days and times there unlawfully and feloniously induce, entice and permit certain persons, whose names are to these jurors unknown, to bet and play at and upon a game played on and by means of such gambling device; against the peace and dignity of the State."

The indictment was regularly assigned to Division Number Twelve of the circuit court for the trial of criminal cases, and a severance was granted to the defendant, who filed his demurrer to the indictment, which was overruled. At the December term, 1908, the defendant was put upon his trial, which resulted in his conviction and his punishment was assessed at two years in the penitentiary. He filed his motions

for a new trial and in arrest, which were heard and overruled, and he was sentenced according to the verdict. From that sentence he has appealed to this court.

At the close of the testimony on behalf of the State, the State entered a *nolle prosequi* as to the first count of the indictment and hence that count is not before us for consideration.

The evidence tended to prove that the defendant Lee was in charge of the buildings known as numbers 410, 411 and 412 North Levee in the city of St. Louis, and he had been in charge of the same for something like three years prior to December 20, 1907. He used number 410 as a barber shop, 411 as a restaurant and dance hall, and the rear portion of 411 and 412 as places for playing craps, at which place large numbers of negroes would congregate and engage in that game. It appears in the testimony that this same place had been raided by the police of the city in June, July and November prior to the date of the arrest of the defendant on December 20, 1907. On the night of December 20, 1907, the defendant was in the rear of number 411 North Levee in charge of a pool table on which a game of craps was being played. The pockets of the pool table had been destroyed and it could no longer be used as a pool table. It appears that on that evening a police officer sent a negro by the name of Hutchison, who was in his employ, to this place, and he was engaged in the game at the time the raid was made by the police about ten o'clock that night. There was testimony to the effect that the defendant had an arrangement whereby the lights at a moment's notice could all be turned off and the entire place left in darkness. The evidence also tended to show that the defendant, on various occasions from June, 1907, to the time of his arrest had made statements to the police officers and to certain of the negroes, that all he wanted was the same kind of treatment that other persons

who were in charge of crap games were given. Officer McMullen of the St. Louis police testified that he was a sergeant of police in that precinct; that he went to defendant's along in November, 1907, and spoke to him about his place in general, about the crap game he was running there, and defendant said to him that "all that he would ask of him was an even break, that is, that I would not raid his place any oftener than I did any other place." "Q. What did he ever say to you, did he ever say anything to you in relation to his running this place? A. He told me he had charge. I asked him if he had charge of the four houses. We were in No. 409 at the time we were talking. I asked him if he were not in charge of the four places, and I spoke to him about this game in general and told him he would have to quit it. He said he could not quit. He says, 'They may be shooting craps down there now.' Well, I said, 'You furnish the table for them and the place to shoot and of course then they are bound to shoot,' and he says, 'You may come around this place whenever you want to get in the places,' and he told me to come to him, and he would take me through, and one day I wanted to get into the back room and he took me through and opened the door for me." He testified further: "I told him that we were going to raid him every time a rush was made of that kind and lock them up. You go ahead and do as you please." "He said every time you come and drop in, raid my game, there will be another game started after you leave; we will show you a crap game when you and Wells are in hell."

Samuel Neill testified that on or about the 10th of May, 1906, he was solicitor for the Bell Telephone Company. He testified that at the request of the Bell Telephone Company he went down to 412 North Levee and asked for the defendant Mr. Lee, and saw him, and he made out a contract for telephone service and the defendant signed it. While the court permitted

this paper contract and another exhibit cancelling the contract for the telephone, to be introduced in evidence, and the record recites that the prosecuting attorney read the paper identified by Samuel Neill, it being a printed form for putting in and rent of a telephone by the Bell Telephone Company of Missouri and dated May 10, 1906, and signed by William Lee, that exhibit is not incorporated in the record in this court. To the introduction of this evidence the defendant at the time objected and saved his exceptions.

The evidence on the part of the State tended to show that the entrance to these three buildings was in the one numbered 411, in which there was a restaurant, on each side of which, in numbers 410 and 412, there was a large dance hall; at the back of the hall in 412 was an old pool table, and in the rear of the restaurant in number 411 there was another pool table, and in the extreme rear of 411 and 412 there was a tunnel or areaway under the alley connecting these two buildings. This area was under the gratings in the rear.

Fred Hutchison testified that on the 20th or 21st of December, 1907, he was in the buildings 410, 411 and 412 Levee, and saw the defendant, witness having gone there with one Marshall; that he went into the back room where there was a pool table and a crowd of men around it and a crap game going on. Dice were being shot on a pool table, and defendant was taking a nickel every time a man would win. He saw him do this a number of times, four or five times. In about fifteen minutes the detective came in and arrested everybody in there. On cross-examination he testified that he had been given money by detective Wells and was directed to go into this place and start a game of craps, with the understanding that in a half hour the detective would come and make a raid upon the place; that this money was given him by Wells

for the express purpose of playing craps and he was sent in there for that purpose and he did play craps; that witness had been convicted in the court of criminal correction for playing policy on three different charges, and had been fined a thousand dollars on each and sent to the workhouse in default. After he had been there about three months he was paroled and on the day he was paroled he was engaged by detective Wells to make cases, and later on he testified that he was never employed by the officer but that one night.

Officer Peter Wells testified that on the 15th of November, 1907, he and other officers raided this place and found a crap game in progress in a room in the rear of number 412, and arrested twenty-two persons and found dice and money on the table. He also raided the same place on July 29, 1907, but on that occasion did not see any gambling, but arrested sixty-seven persons. He testified that he had a conversation with the defendant in July of 1907, in which the defendant said that "it was his place; that he was proprietor there, and all that he wanted was the same treatment that was given other people. He did not want us to raid him and let other crap games around there alone. He did not care if the little games were put out. He could still exist." But defendant would never admit that he was running a crap game. This officer testified that generally when he entered the place to raid he saw the defendant in the restaurant in number 410. On cross-examination he testified that the money which he gave to the witness Hutchison, was furnished by the police department; that when he made the raid on December 20, 1907, he saw nothing of the defendant until after the raid; that defendant was not in the room where the raid was made and the players were arrested; that Hutchison and Marshall were taken with the others to the police station and released and were subsequently taken before the grand jury as witnesses.

Allen Smith testified that he was in the buildings on the Levee on the 29th of July, 1907, having been sent there by Officers Wells and McMullen, and there he saw the fellows shooting craps on "a kinda table." There were about fifteen or sixteen engaged in the game.

I.  As already said, inasmuch as the circuit attorney dismissed the case as to the first count in the indictment and the court so instructed the jury, the sufficiency of that count is not before us for review.  The defendant was convicted under the second count and it is of that count only that he has any right to complain.  By reference to the second count in the accompanying statement, it will be seen that it follows the form which was approved by this court in State v. Locket, 188 Mo. l. c. 418, 423.  The principal contention of the learned counsel for the defendant is that this count is insufficient, because it fails to use the words, "upon which dice were used."  This is a statutory offense and it will be seen by a comparison of this second count with the statute, section 2194, Revised Statutes 1899, as amended by the Act of March 19, 1901, Laws 1901, p. 130, that it uses all the statutory words defining and individuating the offense.

In State v. Rosenblatt, 185 Mo. l. c. 120 et seq., we had occasion to consider an indictment under section 2194, Revised Statutes 1899, and in that case the defendant was charged with unlawfully and feloniously setting up and keeping divers gaming tables and gambling devices, to-wit, one roulette wheel, commonly so-called, one crap table, commonly so called, one chucka-luck table, commonly so called, upon which dice are used, which said gambling devices were adapted, devised and designed for the purpose of playing games of chance for money and property and did then and there unlawfully and feloniously entice and permit divers persons to bet and play at and upon said tables

and gambling devices. And the contention was, in that case, that the indictment did not charge the setting up or keeping any of the tables denounced by the statute, but it was held that the statute was broad enough to include the setting up and keeping "any kind of gambling table or gambling device adapted, devised and designed for the purpose of playing any game of chance for money or property;" and that the charge that the defendant did set up and keep one crap table upon which dice were used, and one chuckaluck table upon which are used dice, which tables were adapted, devised and designed for the purpose of playing games of chance for money and property, and did permit divers persons to bet and play at and upon and by means of such gaming tables and gambling devices, was a good and sufficient indictment, and that a chuckaluck table and a crap table were *ejusdem generis* with the class of gambling devices and gambling tables named in the statute. Afterwards in State v. Locket, 188 Mo. l. c. 422, the decision in State v. Rosenblatt was followed and approved. While it is true that in State v. Rosenblatt the indictment did contain the words, "upon which dice are used," those words were not in the indictment in State v. Locket, supra. And by reference to the statute, we think it is plainly apparent that those words were not necessary to a sufficient indictment under this statute. In neither of those cases was the necessity of using those words considered and passed upon. Inasmuch as this indictment contains every essential element of the crime denounced in this statute, we think the words "upon which dice were used" were unnecessary, and their omission from the indictment in no wise affected its sufficiency.

II. Again it is insisted that, because it charges that "on divers other days and times prior thereto," to-wit, December 20, 1907, the indictment does not advise the defendant of the charge he was to meet. We think this objection to the indictment is not meri-

torious. The State is not required to prove the commission of the offense on the exact date alleged in the indictment. It is sufficient that it be shown that the offense was committed, if at all, on any date prior to the filing of the indictment and within the Statute of Limitation. [State v. Palmberg, 199 Mo. l. c. 243, 244.] We see no objection to the indictment on this account.

III. The indictment having been adjudged sufficient according to the rules of criminal pleading, the next question.is, did the circuit court err in admitting testimony of the witnesses as to the maintenance by defendant of this gambling or crap table in the summer and fall previous to December 20, 1907?

We are cited by learned counsel to State v. Mo. Pacific Ry. Co., 219 Mo. 156. That was a prosecution under the Act of March 19, 1907, to compel all railroad corporations in this State to run at least one passenger train over their railroads each way every day and fixing a fine for every offense. The information charged that the defendant owned and operated a railroad from Sedalia to Warsaw and on February 14, 1908, failed and refused to operate a regular passenger train each way over its said railroad. VALLIANT, C. J., speaking for the Court in Banc, said: "One indicted for committing an act in violation of law on a certain day may be convicted if it be proven that he committed the act specified in the indictment on any day within the period of limitation prescribed for prosecution of the act. But if he is indicted for committing a certain act on a certain day and the State's proof is to the effect that he did the act specified on the day specified, the State would have no right to go back over the period of the Statute of Limitations and prove that he did similar acts on other days." It will be observed that the court was considering a statute which made each violation of the act a distinct

crime.  A like rule has long prevailed in this State in prosecutions for selling intoxicating liquors without a license, each sale being an offense by itself.  It has been generally held that when the indictment charged the selling in a general way without specifying the person, the State may prove a sale within the year, but if the prosecutor fixes a day and a person to whom the sale was made he must elect to abide by his proofs to establish the offense as of that date, and will not be allowed to prove other illegal sales to other persons on other days.  No other rule would notify the defendant of the charge he was to meet and no other rule would protect him in case of a subsequent, prosecution.  [State v. Wilson, 39 Mo. App. 184.] Mr. Wharton in his work on Criminal Evidence (9 Ed.), sec. 104, says: "Where a specific offense is charged, the indictment cannot be sustained by proof of a second offense, even on the same day.  This results from the principle that evidence of offenses collateral to that in the indictment cannot be received, and that the issue should be single.  And should it happen that the evidence discloses several successive offenses, any one of which could sustain a conviction, the prosecution, unless the charge is for a continuous offense, must elect the offense which it will pursue; and when this is done, proof of the other offenses will be excluded under the limitations above expressed."

Now in this case, the offense is the *setting up and keeping* a gambling table and permitting persons to bet and play upon the same for money or property, and it is charged as a continuous offense.  Upon such a charge then was it erroneous to permit the prosecuting attorney to show that this crap table had been maintained in July and November previous to the 20th of December, 1907, the date of the alleged offense? This evidence was introduced to show the knowledge of the defendant, among other things, that large numbers of persons were in the habit **of** congregating

in the back room of his premises and playing craps on the table there, and the evidence as to the raids in July and November failed to show the actual presence of the defendant in this crap table room at the time of those raids, but the evidence also tended to show that he was the proprietor of the place and had control of the lights and of the premises and had been warned by the officers that he must stop the game. The setting up and keeping a crap table or other gambling devices in its very nature is different from the illicit sale of intoxicating liquors under a statute which makes each sale a crime in itself, but the evidence in this case of which complaint is made tended to prove the main proposition, not only that the defendant maintained this crap table on the 20th of December, but had been keeping the same for several months prior thereto, and it was admissible to prove his knowledge of the same and that it was maintained by him and under his control. We think there was no error in admitting the testimony for this purpose, especially as the court limited his offense to the 20th of December, 1907, and all the subsequent proof tended to establish his offense as of that date.

IV. Complaint is made that the court restricted the cross-examination of the negro witness Allen Smith. While the test of any witness is cross-examination, and the defendant was entitled to a searching cross-examination of this witness, we think he had the benefit of it, and that the court did not transgress his rights because it held that asking a witness if he had not received money "for being a snitch" was an improper question. The witness had answered candidly that he had been receiving money for sometime from the police officers for assisting in detecting crap games. The court permitted counsel to develop this fact, and the defendant received the full benefit of it.

V. It is insisted the court erred in admitting the testimony of Neill and the exhibit as to the installation of a telephone in number 412. This testimony is of exceedingly doubtful propriety. It tended to prove that on May 10, 1906, the defendant had provided for a telephone in these premises, and the other exhibits show that it had been removed on the 17th of November, 1906, over a year before the commission of the alleged offense on December 20, 1907. About all that it tended to establish in any way was that in 1906 the defendant was the proprietor of this house number 412, but the same evidence, if it established proprietorship, tended to show by the removal of the telephone that he no longer had control of it. We are inclined to hold that the evidence of putting in the telephone was of little probative force and should have been excluded as too remote to throw any light upon the subject. But in view of the other testimony in the case, we do not think the admission of this testimony constituted reversible error.

VI. Inasmuch as the State entered a *nolle prosequi*, and the court so instructed the jury, there is no merit in the contention that the court failed to require the State to elect.

VII. The defendant contends that there was no evidence to prove the venue of this offense.

As was said in State v. Sanders, 106 Mo. l. c. 195: "It is true no witness testified directly to the fact that the assault was made in that county, but 'it is not necessary that the venue be proved by direct and positive evidence. It is sufficient if it can be reasonably inferred from the facts and circumstances proven.' [State v. Burns, 48 Mo. 438.]" In this last cited case, the point was made that the record did not show that the crime was committed in St. Louis county,

228 Sup—32

but Judge WAGNER, responding to that contention, said: "The witnesses all speak of the murder as taking place on Mullanphy street, but it is not expressly stated anywhere that Mullanphy street is in the county or city of St. Louis. The indictment avers and charges that the crime was committed in the county of St. Louis, and the court instructed the jury that if they believed and found from the evidence that in the county of St. Louis the defendant did assault and kill Ostermeyer, then they should find him guilty, etc. From this instruction the jury must have found that the killing occurred at the place laid in the indictment." So the record in this case discloses that this was a prosecution in the circuit court in the city of St. Louis, and the defendant was charged with having set up and maintained the gambling table in the said city, and the trial was had in the circuit court of the city of St. Louis, and witnesses all referred to the buildings as being on North Levee street, well understood to be in the city of St. Louis by all witnesses and the jurors, and the court required the jury to find and believe from the evidence that the offense was committed in the city of St. Louis and State of Missouri. The question of venue is always a question of fact and may be proved like any other fact. We think that there was sufficient evidence to justify the jury in finding that the offense was committed in the city of St. Louis. [State v. Shour, 196 Mo. 202; State v. Hill, 96 Mo. 358; State v. West, 69 Mo. 404.]

Under this same assignment it is insisted that the defendant should have been discharged because the indictment averred that the defendant induced, enticed and permitted certain persons "whose names are to these grand jurors unknown, to bet and play at and upon the game played," etc., because it appeared from the testimony that witnesses who testified at the trial as to the gambling in defendant's place, were before the grand jury, and the officers who made the raid

arrested certain parties and knew their names, and therefore their names should have been averred in the indictment. This contention is based upon the decision in State v. Stowe, 132 Mo. 199. In that case, this court approved the law as stated by 1 Bishop's Criminal Procedure (3 Ed.), section 549: "If the grand jurors refuse to learn the name when they might, their ignorance of it thus willfully produced, proceeding from no necessity, creates none; and if they lay it as unknown, proof of the facts at the trial will show the allegation to be unauthorized, and there can be no valid conviction thereon. As said by the English judges: 'The want of description is only excused when the name cannot be known.'" We think that the principle of law above announced is well settled, at least in this jurisdiction. In the cases in which it was announced, it appeared in the record that the fact alleged to be unknown must either have been known or could have been ascertained by the exercise of the most ordinary diligence, and the fact itself was developed upon the trial. In this case, however, all that the evidence shows was that there were sixty-seven negroes, men and women, in the room where this gambling device was kept on the night of December 20, 1907, when it was raided. The record does not disclose the names of any of these negroes, or if they were learned by the police, when their names were learned, or that their names were known when the grand jury found this indictment. It does disclose the names of the witnesses who went before the grand jury. And their names are all indorsed upon the indictment, so that the defendant was fully informed as to the witnesses who would appear against him. Moreover, no one who took part in the gambling was a witness before the grand jury and had they been called could have refused to testify. The gravamen of this offense was the setting up and keeping a gambling table and permitting others to play upon it. And the names of those who

played upon it was not an essential fact to be shown. We are clear that the facts shown by this record did not bring this case within the rule announced in State v. Stowe, supra, and this assignment must be ruled against the defendant.

It is also insisted under this assignment that there was no evidence that a game of chance was being played upon the table. We think the evidence shows beyond all question that a crap game was being played on the table; that bets were made upon it, and money lost and won and that defendant received a per cent from all the winners for at least a portion of the time that night, and this evidence sustained the verdict. [State v. Rosenblatt, 185 Mo. 114; State v. Mathis, 206 Mo. 604.] In this last mentioned case, it was said with approval: "In Bell v. State, 32 Tex. Crim. Rep. 187, a crap table was held to be a gambling device within the statute of that State against keeping or exhibiting, for the purpose of gambling, a gaming table or banks."

VIII. It is next insisted that the testimony of the witness Hutchison was such as to require the court to have directed a discharge of the defendant upon the authority of State v. Waghalter, 177 Mo. 676. In that case this court held that if the owner of goods consents to the taking of them by another, though only for the purpose of entrapping and procuring the intending thief, such consent prevents the taking from being larceny, and approved the language of the Supreme Court of Georgia in Williams v. State, 55 Ga. 395, as follows: "It seems to be settled law that traps may be set to catch the guilty, and the business of trapping has, with the sanction of courts, been carried pretty far. Opportunity to commit crime, may, by design, be rendered the most complete, and if the accused embrace it he will still be criminal. Property may be left exposed for the express purpose that a suspected thief may commit himself by stealing it. The owner is not

bound to take any measures for security.  He may repose upon the law alone, and the law will not inquire into his motives for trusting it.  But can the owner directly, through his agent, solicit the suspected party to come forward and commit the criminal act, and then complain of it as a crime, especially where the agent, to whom he has entrusted the conduct of the transaction, puts his own hand into the *corpus delicti,* and assists the accused to perform one or more of the acts necessary to constitute the offense?  Should not the owner and his agent, after making everything ready and easy, wait passively and let the would-be criminal perpetrate the offense for himself in each and every essential part of it?  It would seem to us that this is the safer law, as well as the sounder morality, and we think it accords with the authorities.  [2 Leach, 913; 2 East P. C., ch. 16, sec. 101, p. 666; 1 Car. & Mar. 218; Meigs, 86; 11 Humph. 320; 2 Baily 569.]  In the present case, but for the owner's incitement, through his agent, the accused may have repented of the contemplated wickedness before it had developed into act.  It may have stopped at sin, without putting on the body of crime.  To stimulate unlawful intentions, with the motive of bringing them to punishable maturity, is a dangerous practice.  Much better is it to wait and see if they will not expire.  Humanity is weak; even strong men are sometimes unprepared to cope with temptation and resist encouragement to evil.''

In this case, Hutchison testified that on the night of the 20th or 21st of December, 1907, he was in the defendant's place, 410, 411 and 412 North Levee, and there saw the defendant; that he went into the back room where there was a pool table and a crowd of men around it, and a crap game was going on, dice were being shot on the pool table and the defendant was taking a nickel every time a man would win.  He saw him do this a number of times and in about fifteen

minutes the detectives came in and arrested everybody in there. On cross-examination he testified that he had been given money by detective Wells and directed to go into this place and "start a game of craps," with the understanding that in half an hour the detective would make a raid upon the place. That. this money was given him by Wells for that purpose, and he did play craps on that occasion. The question arises does this evidence bring this case within the principle of Waghalter's case? In that case the detective or agent of the railroad company procured the box of goods to be taken by the driver of a transfer wagon in the first instance from the station in East St. Louis without the driver's initiative in any way, and directed the driver to leave the box of goods at Waghalter's store in St. Louis, and had their officers stationed in the vicinity of Waghalter's store, and immediately upon the goods being placed in the store, Waghalter was arrested and the goods seized. This court held, and we think properly so, that there was no trespass and taking of these goods without the consent of the railroad company, the owner thereof; that in order to constitute larceny the goods must be taken without the consent of the owner. In other words, there could not have been the crime of larceny, where the owner's own act brought about the offense, if any. Now, had the evidence in this case shown that there was no game of craps going on in the defendant's place on North Levee on the night of December 20, 1907, until the witness Hutchison went in there with the money furnished him by the officer Wells, and that at his request a game of craps was started, and that the defendant had permitted it, under these circumstances, we think the case would have fallen within the spirit and decision in Waghalter's case. But while Hutchison went in there under the direction of the officer to start a game of craps and play therein, it transpired that when he

reached there the game was in full blast and was not started by him or at his request, and that he only played in the game as others did. We do not think it can be said that it was owing to his solicitation that the offense was committed, and therefore, as reprehensible as the conduct of the officer was in thus procuring Hutchison to go into the place to start a game and play in it in order that the officer might detect the defendant in a violation of the law, it is plain, we think, that the offense was already complete when Hutchison went into the place and engaged in the game. And it cannot be said, as was said by Judge BLECKLEY in Williams v. State, 55 Ga. 395, that but for the incitement of Hutchison, the defendant might have repented of the contemplated wickedness before it had developed into a sin. So that while we think the conduct of the officers in furnishing money to Hutchison to go into the place and start a game cannot be too severely condemned and reprobated, we think that inasmuch as the defendant was present and permitted the crap game to be played on the table furnished by him for that purpose and was taking off his per cent when Hutchison arrived, he is in no position to avail himself of the law announced in Waghalter's case, but that his offense was complete without any reference to the action of the officers and Hutchison.

• In this connection the defendant also insists that the court should have instructed the jury that the facts testified to by Hutchison constituted him an accomplice within the meaning of the law, and that the court should have instructed the jury to treat his testimony as that of an accomplice, and subject to the caution with which an accomplice's testimony should be received and weighed. An accomplice is a person who knowingly, voluntarily and with common intent with the principal offender unites in the commission of a crime. [Wharton's Criminal Evidence, sec. 440.] One who bears this relation to a crime is a principal in the

first degree and is liable to be charged and punished in the same manner as a principal. [Sec. 2364, R. S. 1899.] While Hutchison was guilty of gambling, it cannot be said that he was a principal in the first degree in that he knowingly, voluntarily and with the common intent of the defendant united in the commission of the offense of setting up and keeping a gambling table or device. His offense was distinctly his own and he was liable to a different punishment, and he could not have been jointly united with the defendant for the offense of setting up and maintaining a gambling table or device. [State v. Umble, 115 Mo. l. c. 461; 12 Cyc. 447; Campbell v. Com., 84 Pa. St. 187.] We think that the instruction of the court as to how they should weigh the testimony of the witnesses was all that was necessary to enable the jury to properly estimate the testimony of the witness Hutchison and there was no error on the part of the court in refusing to instruct that he was an accomplice.

IX. Complaint is made of the third instruction of the court in the usual manner in regard to statements made by the defendant, if any, after the commission of the offense. The insistence is that there were no statements after the commission of the offense. The witness White said he thought he had a conversation with the defendant in December after the raid on the 20th of that month. Under the instruction of the court it was for the jury to determine whether the defendant made any statements after the 20th of December, 1907, and if so how they were to consider such statements.

X. Finally it is insisted that the verdict is insufficient to support the judgment. The verdict is in these words: "We the jury in the above entitled cause find the defendant guilty of setting up gambling devices as charged in the indictment, and assess his pun-

ishment at two years in the State Penitentiary." The verdict is a general one and is unlimited by the words "of setting up gambling devices." The finding is that he was guilty as charged in the indictment and the verdict is sufficient under the rulings of this court. [State v. Bohle, 182 Mo. l. c. 67; State v. Court, 225 Mo. 609; Wallace v. State, 70 Tenn. 29.]

We have thus endeavored to examine all the alleged errors of the court and in our opinion they are not sufficient to reverse the judgment. The defendant seems to have had a fair and impartial trial and there was ample evidence to sustain the verdict of the jury and the judgment must be and is affirmed. All concur.