# MARCH 1927

STATE OF MISSOURI, RESPONDENT, v. WALTER KURTZ ET AL., APPELLANTS.*

In the Springfield Court of Appeals. April 7, 1927.

*Corpus Juris-Cyc. References: Criminal Law, 16CJ, p. 769, n. 91; p. 924, n. 27; 17CJ, p. 189, n. 72; p. 211, n. 5; Evidence, 22CJ, p. 218, n. 89.

*S. V. Medling* and *Gallivan & Finch* for appellants.

*J. M. Massengill,* Prosecuting Attorney, for respondent.

BRADLEY, J.—Defendants were charged by information with unlawfully possessing a still, worm, doubler, cooker, mash tub, mash barrels and 1500 gallons of mash and other equipment and utensils, fit for use in distilling brewing and manufacturing intoxicating liquors. Upon trial defendants were found guilty by the jury and defendant Kurtz's punishment was fixed at a fine of $1000 and ten months in jail, and defendant Chaney's punishment was fixed at a fine of $500 and six months in jail. Motion for new trial was duly filed and was overruled and defendants appealed.

The information charged jointly against the defendants at bar and also against Arch Richards and Wm. Jones. Jones was tried with defendants at bar and was also convicted and his punishment was fixed at a fine of $100 and thirty days in jail, but he did not appeal. Only Kurtz and Chaney prosecute this appeal.

In the motion for a new trial it is alleged that error was committed (1) in refusing an instruction in the nature of a demurrer to the evidence at the close of the case; (2) in admitting evidence; (3) certain conduct and argument by counsel for the State; and (4) in the instructions.

What we shall call the demurrer is based principally upon the contention that there is no substantial evidence in the record to show that the alleged offense was committed in New Madrid county where the venue was laid and where the cause was tried. We think that this is the only question raised by the demurrer that has substantial merit.

There was a barge with a cabin thereon, a houseboat and three gasoline boats anchored at Jay Williams' Island in a chute adjacent to the Missouri side of the Mississippi River. The officers of New Madrid county made a raid on these boats and found defendants thereon, and on the barge they found two complete stills, about fifty mash barrels and about 1500 gallons of mash. The question

presented is this: Is there substantial evidence to show that the place where the boats were anchored is in New Madrid county? The place where the boats were anchored is either in the extreme southeast corner of New Madrid county or in the extreme northeast corner of Pemiscot county. The State contends that there is competent evidence to show that the place is 100 yards or more north of the line between New Madrid and Pemiscot counties, and is therefore, in New Madrid county, while defendants contend that there is no competent evidence to support the State's contention, but that all of the competent evidence on the question conclusively shows that the place is about 220 yards south of New Madrid county line, and, therefore, in Pemiscot county.

The evidence on the question of venue, when assembled, shows about as follows: Dick Eakins a witness for the State: "Q. I will get you to state if you went with the officers at a time when it is said they found a still and some cookers and mash tubs and mash barrels on a fleet of boats? A. Yes, sir. Q. Now, where did you find them? A. We found them over there in a chute. Q. Which side of the chute were they on? A. On the chute from my house, across the chute from my house. Q. Were they lying against the island? A. A mud bar made up between Doctor Jay Williams' Island, a little bar made there; it was right close to that but wasn't against it. Q. What county was that in? A. New Madrid. Q. How do you know it was in New Madrid county; did you live in New Madrid county at that time? A. Yes sir, I did. Q. Which direction is this mud bar from your house where you lived in New Madrid county at that time? A. It was up north of my house. Q. Then the Pemiscot county line was south of your house? A. Yes, sir."

Cross-examination: "Q. I will ask you if you know where the county line is on this side (west of) the levee? A. It is below my house. Q. What determines the line? A. That Cushion Lake, neck of Cushion Lake. Q. Cushion Lake don't extend up to the levee? A. Yes, sir. Q. Clear up to the levee? A. Right up behind the levee it runs. Q. Now then, you say the end of Cushion Lake is the county line up until you get to the levee, on this side of the levee? A. Yes, sir. Q. Do you know of any ditch or drain or any markings on the trees that determines the county line between the levee and the river? A. There is a government guage right over the levee. Q. Government guage don't have anything to do with it? A. That one is right on the county line. Q. Do they put them on every county line. A. No, sir. Q. Do you know that is on the county line? A. Yes, sir. Q. How do you know? A. It is there to show. Q. How do you know it is on the county line—ever see it surveyed out? A. No, sir; I wouldn't know what

angle if he was surveying. Q. You know how a surveyor surveys? A. Yes, sir. Q. Did you ever see anybody take an instrument and run it out to determine just where the line is? A. No, sir. Q. What is the line, is it marked upon the trees? A. Yes, sir, between these two farms it is blazed out. Q. Can you go from that levee, from tree to tree and walk right down that county line from the levee to the river? A. Those trees are placed apart about as far as from here to that street. Q. Is that the county line? A. Yes, sir. Q. Are you swearing that is the county line? A. In between the two farms. Q. Don't you know this county line is set out in the statutes of this State; have you ever looked at the statutes? A. No, sir. Q. Then you don't know what the county line is according to the statute, do you? A. If that aint the county line I don't know it. Q. I say you never read the statute to find out the county line between New Madrid and Pemiscot counties? A. No, sir. Q. Then you don't know what the county line is if you haven't read the statute? A. No, sir. Q. It is a guess with you, you don't know; if that statute is different from what you say, you are wrong? A. If that aint the county line, I'm wrong. Q. Why do you say this is the county line; did you ever see it surveyed? A. Not all the way through I never. Q. All you know about this line is hearsay—what you have heard other folks say? A. Yes, sir.''

Redirect: ''Q. Do you know where Major's mill race is? A. That's where I live. Q. Which direction is Major's mill race from your house where you were living last year, 1924? A. On the south side. Q. How far from your house? A. Not very far. Q. About how far? A. Wasn't over twenty or thirty yards to where the mill sat. Q. Where is the mill race; how far was that from where the mill sat? A. What do you call the mill race? Q. That means the place where the water runs through? A. Well, it's I guess forty or fifty yards from where I lived, may be a little farther. Q. South from where you lived? A. Yes, sir. Q. Which direction was it where you found these boats from your house and this mill race? A. The boats was north of this line I was telling you. Q. About how far north of this line did these boats lay? A. About 100 yards, about that. Q. You know what county you live in? A. Yes sir. Q. Where did you pay your taxes down where you lived last year? A. In this county. Q. In New Madrid county? A. Yes sir. Q. Where did you vote at while you lived there? A. Voted in this (New Madrid) county.''

Lawrence Robbs, witness for the State. ''Q. You may state if you had occasion to go with Mr. Kerr and some other officers on or about the 4th day of June, 1924, to make a raid on what is called the Kurtz fleet of boats? A. Yes, sir. Q. I will ask you if you found this fleet of boats? A. Yes, sir. Q. Where did you find

118

them? A. Well, we found them in above the mill race, north of it and above the line that runs across there—We found it in New Madrid county. Q. Where were these boats moored, where were they tied up? A. They were tied up at the Jay Williams Island—right at the southeast— Q. Do you know what island it was, or was it a mud bar? A. Yes, there is a mud bar here and the island (indicating)—well, the mud bar is right in here and the island right here. Q. The island lays below it? A. Yes, sir, the island right below it. Q. Now do you know where Major's mill race is? A. Yes, sir. Q. Now which direction did you find these boats where you found this mash and stills from Major's mill race? A. North.''

Cross-examination. ''Q. Now then, Lawrence, you say about the county line—You ever live over there along that river? A. No, sir. Q. Now then, I will ask you if you didn't say to me (Mr. Medling) and others that you didn't know where that line was? A. I did; I didn't know at that time. Q. About two weeks ago? A. Somewhere around two weeks. Q. Now, where is the line just this side of the levee? A. Right here where the slough comes out (indicating). Q. Called Cushion Lake? A. Yes, sir. Q. That is what is the county line when you first strike the levee from this side, the old Cushion Lake? A. Yes, sir. Q. What would you go by—(on the east side of the levee)? A. By some blazes and by what Rositer, where he ran it out. Q. That's the only way you could tell the line? A. Yes, sir, that's the only way you can tell a line, the way I know when it is run out. Q. You don't know how many degrees south or east this line runs? A. No, sir. Q. And you never saw this line run with instruments? A. I saw him (W. B. Rossiter, a civil engineer) sighting with one. Q. You never saw him run an instrument and men go and take bearings there? A. I saw him sighting, yes, sir. Q. Now who told you that this place you are talking about was the line? A. He (Rossiter) told me he run it out twelve years ago, and he told me of a certain place over there, blaze was on a gum tree over there; that's what he told us. Q. You say that is the county line because of the blazes down there? A. Yes. Q. If that blaze isn't the line, you are wrong? A. That's the way they always blaze them. Q. That's the only thing you are going by when you say it is in New Madrid county; if that blaze isn't the line you don't know whether it is in New Madrid county or not? A. I never looked at no record; only just going by the blazes, the way they run any line. Q. You are judging it to be the county line because of those blazes? A. Yes. Q. That is the only reason you say that was the county line and those boats were in New Madrid county because that's what you considered south of the blazes? A. North of the blaze. Q. All you are going by was those blazes? A. Yes, I didn't have no record only what Rossiter

said, and said he run it twelve years ago and went right to the tree where it was and I watched him do it and that made me have faith in him. Q. Do you know whether or not J. J. Williams owns that island where these boats were? A. I am told he does. Q. Did you all show this surveyor you are talking about where the boats were? A. Yes, sir. Q. You never have read this statute, you don't know where the line is according to the statute? A. No, sir, only just what the surveyor told me.''

Redirect: ''Where you found these boats, was it north of the line he showed you? A. Yes, sir. Q. For what purpose had you and Mr. Eakins and Mr. Rossiter, this surveyor, gone there? A. We went there to see where the line was. Mr. Massengill wanted us to. Q. Mr. Massengill go with you? A. Yes, sir. Q. He (Rossiter) showed you men Major's mill race, too? A. Yes, sir.''

W. E. Gotcher, a witness for the State, testified that he had been surveyor of New Madrid county that a map shown him presented a fair representation of the line between New Madrid and Pemiscot counties; that the county line, from Cushion Lake to the Mississippi River, runs southeast; that if the boats raided were 100 yards north of the line that runs to the river they were in New Madrid county; that he had read the statute fixing the county line, and that if the boats were north of the line described in the statute they were in New Madrid county.

Wilce Wilburn a witness for the State testified that he went with Rossiter and others to locate the county line, and that the boats were north of the line as it was pointed out by Rossiter on that occasion.

A few weeks prior to the trial, June 8, 1925, W. B. Rossiter, at the request of the prosecuting attorney, went with the prosecuting attorney and others to or near the place where the boats were anchored when raided, and went for the purpose of ascertaining their location as to being in New Madrid or Pemiscot county. On this occasion Rossiter did not make an actual survey, but reasoned from a line he had run some twelve years prior, and from blazes he found, that the place where the boats were anchored was in New Madrid county. A short time after the trip made at the request of the prosecuting attorney, Rossiter, at the request of one of the attorneys for the defendants, went back and made an actual survey and from the survey actually made he testified that the place in question was about a half a quarter over in Pemiscot county and was not in New Madrid county. In rebuttal the evidence of those who accompanied Rossiter when he made the partial survey at the request of the prosecuting attorney was to the effect that he, Rossiter, on that occasion found and identified a blaze he had made some twelve years prior when he was locating the county line, and that from this blaze and what other observations made he stated that the place where

the boats were anchored was 100 yards over in New Madrid county, and that he would so swear in any court.

Section 9382, Revised Statutes 1919, describes the boundary line of Pemiscot county. This statute so far as pertinent here reads: "Beginning in the middle of the main channel of the Mississippi River, immediately opposite Major's mill race; thence to the Cushion Lake bayou," etc.

The statute fixes Major's mill race as the county line from the mouth of the mill race to Cushion Lake, and Rossiter's survey showed that the mill race ran south fifty-seven degrees east. At the time Rossiter made the survey for the defendants he had with him the field notes made by a Mr. Robbins, a former county surveyor, who had run this line, and Rossiter testified that Robbins' notes showed the mill race to run south fifty-nine degrees east, and that the Robbins survey would place the line 184 feet farther north than his survey placed it. Rossiter admitted that he had run the line some twelve years prior, but denied that he, when at the place with the prosecuting attorney, found and identified his blazes made twelve years prior, but stated that he took the word of those with him that the blazes had been kept renewed, and just assumed that the blazes he saw were on the line and that he made no complete survey on that occasion. He also testified that he learned afterwards that the blazes had not been kept renewed.

Defendants when this cause was argued submitted for our inspection a map of Pemiscot county, and asserted that it is the official map of said county. This map was submitted to support defendants' contention that the Jay Williams Island is in Pemiscot county. But this map was not presented at the trial and was not in evidence, hence, what it may show is not part of the record before us.

Venue, as any other fact in issue, must be proved, but the law does not require such fact to be proved by direct and positive evidence. It is sufficient if such fact can be reasonably inferred from the facts and circumstances in evidence. [State v. Shour, 196 Mo. 202, 95 S. W. 405; State v. Lee, 228 Mo. 480, 128 S. W. 987; State v. Daugherty, 106 Mo. 182, 17 S. W. 303.] We think that there was sufficient evidence to take to the jury the question of venue. We might state here that failure to prove the venue as laid would not necessarily have operated to discharge the defendants, but in such case the court, at any time before verdict, might have ordered the cause transmitted to the proper county. [Sec. 3729, R. S. 1919.]

The evidence admitted, of which complaint is made, is that of a hearsay nature upon the question of venue. Hearsay evidence is admissible to prove the location of ancient boundaries in which the public have an interest. [Maysville v. Truex, 235 Mo. 619, 139 S.

W. 390; St. Louis Pub. Schools v. Risley's Heirs, 40 Mo. 357, 1. c. 371.] In the last-cited case the court uses this language: "The law seems to be well settled that tradition, reputation and hearsay are admissible to prove the extent, character and existence of public rights as regards the location and boundaries of things of a public nature."

The present boundary line between New Madrid county and Pemiscot county was fixed in 1868, Laws 1868, page 20. That this line is ancient and that the public has an interest therein will be conceded. In such case, according to the authorities cited, hearsay evidence is admissible to establish the location of this line. It might be contended, however, that the hearsay evidence complained of here did have its source in ancient tradition, but to some extent the hearsay admitted was founded upon reputation. But if it be conceded that the hearsay evidence admitted was not anchored in tradition and reputation of such duration as to give it standing, yet defendants are not in a position to justly complain, because the cross-examination voluntarily brought out about as much hearsay as did the direct examination. It is our conclusion that no reversible error was committed in the admission of evidence.

This cause was vigorouly prosecuted and as vigorously defended, and at times more heat was shown than light. Some conduct of and some argument by counsel for the State indicate excessive zeal which has oftentimes been the source of error, but in such situation the meat of the point is,: From the record, including the verdict, is it reasonable that harm came to the defendant or defendants, as the case may be, because of the conduct and argument of counsel? We are not fully persuaded that the conduct and argument complained of here is of such moment as to amount to reversible error.

In the motion for a new trial the instructions are complained of, but in their brief defendants do not point out in what particulars the instructions are erroneous. The judgment should be affirmed and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.