ELIJAH WILLIAMS, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. Though, in a revision of the list of persons qualified to serve as jurors, certain names already drawn as grand jurors were dropped from the list, these persons are, nevertheless, qualified to serve at the term of the court for which they were drawn, and a bill of indictment found by them, with others, at that term, will not be quashed because their names are not on the new list.

2. If it appear from the minutes of the court that a bill of indictment was found in the present year, an entry at the conclusion of the bill, giving it date in a future year, will be disregarded.

3. If one pretending, by way of artifice, to be an accomplice, but believed by the accused to be a real accomplice, perform acts at the instance of the

owner of the goods, amounting to the physical constituents of larceny, the pretended accomplice represents the owner as to such acts, and not the accused, although the accused may have concurred in the acts and thought he prompted them. Such acts of the supposed accomplice cannot be imputed to the accused as legally criminal, inasmuch as they really proceed from the joint will of the *owner* and the accomplice, and not from the joint will of the *accused* and the accomplice.

4. If one deemed an accomplice by another who intends to commit larceny, is really not so, but has only assumed the character in order to pass with the other through the forms of the intended larceny, so that detection and arrest may be more certain, and such false accomplice, by direction of the owner of the goods, deliver the goods to the other, there is no taking without the consent of the owner, and the offense of larceny is not committed.

5. Nor is it larceny by the accused if such false accomplice, not being expressly directed by the owner, make such delivery of his own motion, after being instructed by the owner to tell the accused to come and get the goods, and after the accused has come for them accordingly.

Criminal law. Grand jurors. Indictment. Accomplice. Larceny. Before Judge KIDDOO. Miller Superior Court. April Term, 1875.

Reported in the opinion.

I. A. BUSH, by JACKSON & CLARKE; HENRY C. SHEFFIELD, for plaintiff in error.

JAMES T. FLEWELLEN, solicitor general, by A. HOOD, for the state.

BLECKLEY, Judge.

1. The bill of indictment was found by grand jurors, some of whom, after being drawn to serve at that term of the court, had been dropped from the general list of persons qualified and liable to serve as jurors on a revision of the list by the proper officers. This was made a ground of motion to quash the bill. It was promptly overruled for the reason that the revised list was made for the purpose of designating the names from which future juries were to be drawn, and had no relation whatever to the juries which had already been drawn to do duty at the next term of the court—the term at which the

indictment was found. Any other construction would subject both the grand jury and the petit juries to a process of disintegration every time a revision of the general list takes place.

2. Another ground of motion to quash was, that the indictment, upon its face, by an entry at the close of it, purported to have been found at October term, 1877. This, also, was properly overruled. This entry was not an essential part of the indictment, and giving the year 1877 instead of the year 1874, was evidently a clerical error. The true date appeared on the minutes of the court, and was reproduced on the back of the indictment.

3. The trial proceeded, and the defendant was convicted. He was charged with stealing thirty pounds of seed cotton, of the value of $1 00. It appeared in evidence that the cotton was on the owner's plantation, in the possession of his tenant or agent. The agent, during the day, reported to the owner, that the defendant wanted to buy or get some cotton, and the owner replied : "Let him have it, and I will be there at the getting." That night, the owner, with a party of friends armed with guns, concealed themselves near the cotton house. As testified by the owner, he was told, at the conversation in the day, by his agent, that the defendant would be there that night to get the cotton. He also testified that, on taking his position at night, he called out his agent and asked where the defendant was. Being told that he was in the woods about a quarter of a mile off, he directed the agent to go and tell him to come and get the cotton. The agent went, and after a short absence returned in company with defendant. Leaving defendant at the cotton house, within a few steps of where the owner and his party lay concealed, the agent went to his dwelling house, brought out a basket of cotton, delivered it to defendant, who moved off with it, and just then, the owner cried, "halt !" and his party discharged their guns in the air ; the defendant dropped the basket, ran off in the darkness, and made his escape. The court charged the jury, in substance, that if the defendant and his associate in the transaction (the owner's agent,) united in a common intent to

steal the cotton, combining and confederating for that purpose, in executing the common intent, and *one* of them did the actual taking and carrying, they were both guilty. Also, that if the agent had no intent to steal, but the defendant believed he had, and so combined and confederated with him to steal, and the agent handed him the cotton, and he took it and removed it any distance whatever, he was guilty. There is no evidence in the record upon which to charge the defendant with any taking and carrying away done by his supposed accomplice. The evidence is clear that that person was in mental and moral concert with the owner, not with the accused. It is incredible that he was engaged in stealing during this transaction. There was no guilty taking or carrying done by him, and it was error for the court to make any charge based on that hypothesis. The defendant is responsible alone for such taking and carrying away as were done by himself. According to the evidence, the acts of the counterfeit accomplice proceeded from the joint will of himself and the owner, not from the joint will of himself and the accused. He, with the owner, was running on the line of detection and arrest. The accused had a supposed ally, but not a real one; he was running by himself, on the line of guilt and impunity. His pretended accomplice, being a person of sound memory and discretion, could do no act which would render the defendant guilty, for the former was making no effort to become guilty himself. He was, in fact, only a detective, not a thief.

4. The second position of the charge is equally erroneous, when applied to the facts of this case. The evidence is clear and uncontradicted that the cotton was delivered by the owner's agent. As testified by the latter, the owner said, during the day, "Let him have it, and I will be there at the getting." As testified by the owner himself, he said, at night, "Go and tell him to come and get the cotton." Either of these expressions might, without much strain, be construed into a direction on the part of the owner to deliver the cotton, and it was in fact delivered. There was no trespass committed in the taking. There was no taking without the

owner's consent. True, the consent was given for a purpose quite aside from any design to part with the property; but, if given at all, and the intended larceny was cut off as soon as the owner could, after delivery, cry halt! and fire off the guns, what taking was there which could, with any truth, be said to be without his consent? If the property was delivered by the owner's direction, and with his consent, it can make no difference legally, although it does morally, that the accused did not know of such direction and consent. Suppose the owner, instead of acting by his agent, had acted in person, and delivered the cotton from his own hands, the defendant not knowing him to be the owner, but believing him to be another thief and a confederate with himself in the supposed larceny, would not an essential element of legal larceny be wanting?

5. But were it even granted that the agent made delivery on his own motion, without the owner's consent, there was too much active participation by these two persons in this transaction for it to amount to larceny on the part of the accused. It seems to be settled law that traps may be set to catch the guilty, and the business of trapping has, with the sanction of courts, been carried pretty far. Opportunity to commit crime, may, by design, be rendered the most complete, and if the accused embrace it he will still be criminal. Property may be left exposed for the express purpose that a suspected thief may commit himself by stealing it. The owner is not bound to take any measures for security. He may repose upon the law alone, and the law will not inquire into his motive for trusting it. But can the owner directly, through his agent, solicit the suspected party to come forward and commit the criminal act, and then complain of it as a crime, especially where the agent, to whom he has entrusted the conduct of the transaction, puts his own hand into the *corpus delicti*, and assists the accused to perform one or more of the acts necessary to constitute the offense? Should not the owner and his agent, after making everything ready and easy, wait passively and let the would-be criminal perpetrate

the offense for himself in each and every essential part of it? It would seem to us that this is the safer law, as well as the sounder morality, and we think it accords with the authorities: 2 Leach, 913; 2 East. P. C., ch. 16, section 101, p. 666; 1 Car. & Mar., 218; Meigs, 86; 11 Humph., 320; 2 Baily, 569.

It is difficult to see how a man may solicit another to commit a crime upon his property, and when the act to which he was invited has been done, be heard to say that he did not consent to it. In the present case, but for the owner's incitement, through his agent, the accused may have repented of the contemplated wickedness before it had developed into act. It may have stopped at sin, without putting on the body of crime. To stimulate unlawful intentions, with the motive of bringing them to punishable maturity, is a dangerous practice. Much better is it to wait and see if they will not expire. Humanity is weak; even strong men are sometimes unprepared to cope with temptation and resist encouragement to evil.

Let the judgment be reversed.