## 6660.  EDMONDSON v. THE STATE.

One who employs another to steal an article from the owner is not guilty of larceny where the person so employed and taking it from the owner acts with the owner's consent and as his agent.

DECIDED JUNE 5, 1916.

Indictment for larceny from house; from Gordon superior court —Judge Fite.  May 17, 1915.

*Tye, Peeples & Jordan, Starr & Paschal, Maddox, McCamy & Shumate, Neel & Neel,* for plaintiff in error.

*J. M. Lang, solicitor-general,* contra.

BROYLES, J.  The defendant and several other persons were indicted for the offense of larceny from the house, it being alleged that they had stolen certain valuable papers from the safe of Davis, the prosecutor, which was in the storeroom of Parsons, one of the defendants.  The papers were taken from the safe on two different occasions.  Parsons was the person who actually did the taking both times, and the evidence, taken as a whole, demands a finding that on both these occasions Parsons was only a sham accomplice of Edmondson and his other alleged codefendants, and that when he abstracted the papers he was really acting as the agent of Davis, the owner of the papers, and took them, if not with the owner's express knowledge and consent, at least with his implied knowledge and consent.  Davis himself positively and unequivocally admitted on cross-examination that on both occasions he consented to the taking of the papers by Parsons, and that he and Parsons had talked about it on several occasions before the papers were taken, and that before they were taken the first time he (Davis) had prepared bogus statements and placed them with the papers so as to deceive Edmondson when he should obtain and read them.  This being true, under the ruling in *Williams* v. *State,* 55 *Ga.* 391, no larceny of any kind was committed.  It follows that the verdict finding Edmondson guilty of the offense of larceny from the house was contrary to law and the evidence, and the court erred in overruling the motion for a new trial.

This ruling practically disposes of the case, and it is unnecessary to consider the other questions presented in the record.

*Judgment reversed.*

RUSSELL, C. J., concurring specially.  I am as well satisfied as my colleagues are that the plaintiff in error is entitled to a new

trial, but I am so thoroughly committed to the principle that juries are the sole arbiters of questions of fact that I can not bring myself to the conclusion that this court has the right to pass upon the credibility of the witnesses in a trial court. Had I been upon the jury I should not have convicted the accused, because I think there are circumstances which indicate that the witness Davis should be believed rather than the witness Parsons, but I do not think I, as Judge, have the authority, especially at this distance and in total ignorance of the appearance or credibility of either Davis or Parsons, to say which one should be believed rather than the other. And I think it material to hold that papers such as those described in the indictment now before us may be the subject-matter of larceny. In my opinion, the word "thing," in section 176 of the Penal Code, relating to larceny from the house of "any money, or any other thing, under the value of fifty dollars," etc., is comprehensive enough to include written signed statements of witnesses and written memoranda of evidence relating to pending or contemplated lawsuits.

Edmondson, Parsons, Costephens, and Evans were jointly indicted for larceny from the house. The State elected to try Edmondson separately, and he was found guilty and sentenced to pay a fine of $500 or serve twelve months in the chain-gang. Construing the evidence, as we must, most strongly in favor of the verdict, it appears that in July, 1914, a fire originating in the depot of the Western & Atlantic Railroad at Resaca spread to the lumber-yards of one Davis, and destroyed a large quantity of his lumber. He occupied one corner of the storehouse of the defendant Parsons, and had in this space a desk, a table, and an iron safe. He and Parsons were friendly, and Parsons charged him to rent. Davis had on his desk, and later in his safe, certain written statements of witnesses and certain memoranda relating to his proposed suit against the railroad company. The defendant Costephens was agent of the railroad company. Edmondson and the other railroad employees were preparing evidence for the railroad company in the threatened suit of Davis, and they hired Parsons to aid them, agreeing to pay him $25 for his services in assisting them to get evidence. Parsons told the other defendants of the statements which Davis had in his possession. He expressed a willingness to obtain possession of these

statements and permit the other defendants to read them. He knew the combination of Davis's safe. The statements had been placed in a drawer of the safe, and he opened this drawer with a key furnished him by the defendant Costephens. He took the papers out of the safe on two occasions. The first time, by agreement, he met Costephens and Evans in the village cemetery, where the three of them read the papers, and he afterwards returned them to the safe. About three weeks later he again abstracted the papers from the safe and turned them over to Evans, who brought them to Atlanta and showed them to Edmondson. In the same envelope with the statements bearing upon the fire was a check for $1.25, belonging to Davis, which was taken along with the other papers, and, according to the evidence of Davis, was never returned. · Parsons posed as a confederate of the other defendants and concealed from them his true relations to Davis in the matter. Davis testified, that when he learned of the desire of the railroad employees to see the statements, he set a trap for them by putting along with them a number of bogus statements, which purported to be signed by persons who knew the origin of the fire, and would testify in such a way as to fix liability upon the railroad company; that he did this for the purpose of helping his purposed suit for damages, in the event the defendants inspected his evidence, and also for the purpose ·of setting a trap for the railroad employees. He was in conference all the while with his attorneys in the proposed suit for damages.

There is sharp conflict in the evidence, between Parsons and Davis, as to when Davis first knew of the plan of the defendants. Davis testified as follows: Before the papers were taken out the first time "Parsons and I talked it over five or six times, or perhaps more. . . When I consented for Parsons to take the papers out of my safe I had in mind, as a reason why I was willing for him to do it, that it would help me when I tried my case. I thought it would. It was certainly the reason why I was willing for them to take my papers out. . . I am not going to prosecute Parsons. I do not want him punished, and I did not want any bill against him, but one was found. . . Parsons knew it was perfectly agreeable with me, and I was perfectly willing for him to do it." On the other hand Parsons testified: "I never had any right or authority to go into the inside drawer of Davis's safe.

I never had a key to the drawer. Davis and I did not talk at all about my going into the safe the first time. It was after the first time we talked about it. Davis told me to let them have them when I told him about wanting them. He told me to do whatever they suggested." The bogus statements referred to above were placed with the genuine statements prior to the time the papers were taken out of the safe the first time, and this circumstance tends to substantiate Davis's testimony that he knew of the plan all the time and consented to it.

One of the essential elements of the crime of larceny is the taking of property from the possession of the owner without his consent. If the owner of property consents that his agent or confederate take it and deliver it to the defendant for the purpose of entrapping the defendant, the latter is not guilty of larceny. The rule is otherwise where the defendant himself does the taking from the owner, the agent or confederate of the owner being present and acquiescing in the defendant's act. Where the owner's agent or confederate himself does the actual taking out of the possession of the owner, and delivers the property to the defendant, the latter has committed no trespass, and therefore can not be guilty of larceny. *Watson* v. *State,* 6 *Ga. App.* 801 (65 S. E. 813); *Jenkins* v. *State,* 13 *Ga. App.* 695 (79 S. E. 861). The line of demarcation between affording an opportunity for another to commit a crime, on the one hand, and actually causing the commission of an act which is not a crime, on the other, is sharply drawn. A victim can set a trap for the defendant and then sit by, either himself or through his confederate, and watch the defendant walk into it, but the defendant himself must not commit the crime. "It must appear that the person charged with the offense did himself everything necessary to make out a complete offense against the law. Nothing that was done by the person present with the knowledge and consent of the victim will be imputed to the accused; and if, in order to constitute the offense, it is necessary that something done by such person shall be imputed to the accused, then the prosecution will fail." *Dalton* v. *State,* 113 *Ga.* 1037 (39 S. E. 468). Applying this rule to the instant case, the acts of Parsons, so far as known to Davis and not actually participated in by the other defendants, can not, in my opinion, be imputed to the other defendants. Parsons alone

took the papers from the safe, and none of the other defendants participated in the actual taking; they simply read the papers which Parsons had taken and delivered to them. The undisputed evidence in the record is that before the papers were taken out of the safe by Parsons the second time, Davis knew and consented to that taking by Parsons, and that Parsons was the real confederate of Davis. There was, therefore, in the second instance, no taking out of the possession of the owner against his consent; and consequently in the second taking no larceny was committed by any one. "There was no taking without the owner's consent. True, the consent was given for a purpose quite aside from any design to part with the property. . . If the property was delivered by the owner's direction and with his consent, it can make no difference legally, although it does morally, that the accused did not know of such direction and consent." *Williams* v. *State, 55 Ga.* 391, 395.

The State contends that this principle is not applicable to the present case, because there is sufficient evidence to authorize the jury to find that all four of the defendants originated the plan or conspiracy to get possession of the papers, before it came to the knowledge of Davis, and that thereafter the act of each defendant was the act of all. This would doubtless be true if the conspiracy had been allowed to ripen to criminal maturity before one of the conspirators became a traitor to the other conspirators and a confederate of the victim. Parsons could not at the same time be a coconspirator with the other defendants and a confederate of the owner in the sense that his acts could be imputed to his former accomplices. As was well said by Judge Bleckley, in *Williams* v. *State,* supra: "According to the evidence the acts of the counterfeit accomplice proceeded from the joint will of himself and the owner, not from the joint will of himself and the accused. He, with the owner, was running on the line of detection and arrest. The accused had a supposed ally, but not a real one; he was running by himself, on the line of guilt and impunity. His pretended accomplice, being a person of sound memory and discretion, could do no act which would render the defendant guilty, for the former was making no effort to become guilty himself. He was in fact only a detective, not a thief." Even though the defendant be the originator of the plan, yet if before its consum-

mation the victim learns of it and does, or consents that his agent or confederate do, any act without which the crime would be incomplete, and in the doing of which the accused does not participate, the prosecution will fail. Topolewski v. State, 130 Wis. 244 (109 N. W. 1037, 7 L. R. A. (N. S.) 756, 118 Am. St. R. 1019, 10 Ann. Cas. 627); Connor v. People, 18 Colo. 377 (33 Pac. 159, 25 L. R. A. 341, 36 Am. St. R. 295). Per contra, it has been held that a conviction of larceny will not be prevented by the fact that one of the supposed confederates in the plan had informed the police and the intended victim and was acting with them for the purpose of detecting or punishing the guilty parties, if the latter had no knowledge of it and performed *all the acts* necessary to consummate the crime. Commonwealth v. Hollister, 157 Pa. 13 (27 Atl. 386, 25 L. R. A. 349).

Larceny involves not only animus furandi in the accused, but also non-consent in the owner. As was remarked by Judge Bleckley in the case of *Williams* v. *State,* supra, in discussing whether the owner had not consented to the taking, "the accused may have repented of the contemplated wickedness before it developed into act. It may have stopped at sin, without putting on the body of crime. To stimulate unlawful intentions, with the motive of bringing them to punishable maturity, is a dangerous práctice. . . Humanity is weak; even strong men are sometimes unprepared to cope with temptation and resist encouragement to evil." In this case the motive of the victim was not primarily to bring the defendants to punishment, but he encouraged the commission of the crime for the purpose of helping his contemplated suit for damages against the railroad company, and, no doubt, thought that by putting with his genuine evidence bogus statements, tending strongly to fix liability upon the railroad company, he would obtain a very advantageous settlement of his suit for damages. And if he had obtained such a settlement I doubt whether the grand jury, of which he was a member, would have been informed of the matter. Lucri causa prompts not only the commission of larceny, but other acts equally reprehensible, if not equally criminal.

As jurors the members of this court might find from the evidence that Davis knew of and consented to the taking of his papers by Parsons on both the first and the second occasions; but in

my opinion, we have no power to decide any material conflict in the evidence, however slight it may be, and Parsons swears that Davis did not know of the first taking; and although Davis himself says that he and Parsons had talked of the matter five or six times, and perhaps more, prior to the first taking, and although the bogus statements in the same envelope prior to the first taking are pregnant with proof that Davis knew the papers were going to be taken, yet the jury must decide this conflict in the evidence. For if the defendants entered into a conspiracy (as the evidence authorized the jury to find) to extract from Davis's safe the papers described in the indictment, and Davis did not know of and did not consent to the taking by any one of the defendants, then each of the defendants would be liable for the act of every other, and, under the rule that in misdemeanors all who in any wise participate are principals, all the defendants, including Parsons, would be guilty of larceny. The trial judge, however, submitted to the jury both the first and second taking in such a manner as to authorize the jury to find that Edmondson would be guilty of larceny in connection with the second taking, if he, together with the other defendants, had originated the plan, even though before its consummation Davis was informed of it and consented to all that Parsons did. This was error, for, as we have already said, after Davis was informed by Parsons of the plan and agreed to it, then nothing that Parsons did in carrying out the plan could be imputed to the other defendants.

The learned attorneys for the plaintiff in error argue that the papers described in the indictment can not be the subject-matter of larceny from the house, and that, therefore, the verdict is contrary to law. Section 176 of the Penal Code, defining larceny from the house, says, among other things: "Any person who shall, in any dwelling-house, store, shop, warehouse, or any other building, privately steal any money, or any other thing, under the value of fifty dollars, shall be punished as for a misdemeanor." The language "any other thing" is in our opinion comprehensive enough to include written statements of the kind described in the indictment. In Bouvier's Law Dictionary (Rawle's 3d ed.), 3268, the word "thing" is defined as follows: "By this word is understood every object, except man, which may become an active subject of right. Code du Canton de Berne. . . In this sense

it is opposed, in the language of the law, to the word person." In Webster's Unabridged Dictionary the word "thing" is defined as: "An inanimate object, in distinction from a living being; any lifeless material." "Whatever exists, or is conceived to exist, as a separate entity; . . any separable or distinguishable object of thought." I conclude, therefore, that anything,—that is to say, any material object except man,—which has any intrinsic value, however small, can be the subject-matter of larceny from the house. It is not necessary that the thing should have what is known as a "market value," in the sense that it would bring a price in the market. It is sufficient that it has any intrinsic value to the owner. For example, a photograph of a dead friend, or a letter from my child, may have absolutely no market value, but it has an intrinsic value to me; and if any one enters my house and steals these objects from me he is guilty of larceny from the house, within the meaning of section 176 of the Penal Code. The trial judge gave in charge to the jury the definition of larceny from the house as contained in section 175, and did not give in charge section 176; and in my opinion that is mandatory cause for a new trial. The indictment was not under section 175, and this section should not have been given in charge. *Kimbrough* v. *State,* 101 *Ga.* 583 (29 S. E. 39); *Jenkins* v. *State,* 14 *Ga. App.* 276 (80 S. E. 688).

3. It is argued that the verdict is contrary to evidence because it indisputably appears from the evidence that there was no intention on the part of the defendants permanently to deprive Davis of the statements; that their intention was simply to use the statements. Although intent to appropriate is essential to larceny, yet an appropriation may be made even though there be a purpose to return the property to the owner, if the purpose is to make use of the temporary possession and subsequently return to the owner with a view of obtaining a pecuniary right, interest, or advantage therein. *Slaughter* v. *State,* 113 *Ga.* 284, 287 (38 S. E. 854, 84 Am. St. R. 242); *Adams* v. *State,* 12 *Ga. App.* 808 (78 S. E. 473).

Furthermore, the question as to the intent with which an act is done is so peculiarly a jury question that, in my opinion, this court is without the power to set aside the verdict on this ground, even though we feel convinced that the defendant acted with no criminal intent.