### 16138. RHODES v. GUNN.

BELL, J. 1. The exception to the judgment overruling the demurrer to the petition, not having been referred to in the brief of counsel for the plaintiff in·error, is treated as abandoned. *Atkinson* v. *Olmstead*, 140 *Ga.* 100 (2) (72 S. E. 720); *Union Warehouse Co.* v. *Roper*, 21 *Ga. App.* 182 (1) (94 S. E. 74).

2. Although it is true that, where a married woman borrows money for the purpose of paying her husband's debts, and the lender, though knowing of her purpose, is not the husband's creditor who is thus to be paid, and is not a party to the arrangement or scheme between the husband and wife which results in the making of such contract by her, she will be liable for the money so borrowed (*Rountree* v. *Rentfroe*, 139 *Ga.* 290 (2) (77 S. E. 23); *Garrett* v. *Thornton*, 157 *Ga.* 487 (3) (121 S. E. 820); *Longley* v. *Bank of Parrott*, 19 *Ga. App.* 701 (1) (92 S. E. 232)), still a wife can not bind her separate estate by any contract of suretyship nor by any assumption of the debts of her husband (Civil Code (1910), § 3007), and "No superficial appearance will be permitted to lead the court away from the true inwardness of the transaction." *Gross* v. *Smith*, 31 *Ga. App.* 95 (1) (119 S. E. 541).

3. The testimony of a party who offers himself as a witness in his own behalf is to be construed most strongly against him when it is self-contradictory, vague or equivocal. *Shepard* v. *Chappell*, 29 *Ga. App.* 6 (2) (113 S. E. 23); *Woods* v. *Mercantile Bank & Trust Co.*, 32 *Ga. App.* 106 (122 S. E. 819); *Reaves* v. *Columbus Electric &*

*Power Co.*, 32 *Ga. App.* 140 (2) (122 S. E. 824). Thus, whether the testimony of the husband and the wife, to the effect that the wife signed the note sued on merely as the husband's surety, was of such a character that the jury would have been authorized to disbelieve each of these witnesses, and, thereupon, to base their finding solely upon the other evidence, it affirmatively and indisputably appears from the plaintiff's own testimony that the bond for which the note was given was indorsed only to the husband, to whom it was delivered, that it was thereupon placed by him with his creditors, and that his wife received none of the proceeds thereof. From these circumstances, together with the others shown in the plaintiff's testimony, construed reasonably against her, it conclusively appeared that the defendant wife signed the note only as surety. The verdict found in the plaintiff's favor as to that defendant was therefore contrary to the evidence. *Jones* v. *Weichsel*, 115 *Ga.* 369 (41 S. E. 615).

4. This was a suit upon a contract, and not an action for fraud. Whether the lender could be *defrauded* into believing that a married woman could enter into a contract of suretyship, the mere fact that the defendant wife, together with her husband, may have known at the time of the transaction that her promise as a surety was not binding would not operate to change the rule and to render her liable on the contract where otherwise she was not. *Hood* v. *Duren*, 33 *Ga. App.* 203 (2) (125 S. E. 787); *Parks* v. *Simpson*, 124 *Ga.* 523 (2) (52 S. E. 616); *Peacock* v. *Horne*, 159 *Ga.* 707 (5) (126 S. E. 813).

5. These rulings being controlling, it is unnecessary to pass upon the special assignments of error. *Liverpool &c. Ins. Co.* v. *Hughes*, 145 *Ga.* 716 (4) (89 S. E. 817); *Edmondson* v. *State*, 18 *Ga. App.* 233 (89 S. E. 189).

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*

DECIDED MAY 19, 1925.

Complaint; from Taliaferro superior court—Judge Shurley. December 1, 1924.

To a suit upon a note signed by J. A. Rhodes and his wife, she set up the defense that she executed the note as surety for her husband. The trial having resulted in a verdict against both defendants, Mrs. Rhodes made a motion for a new trial upon the usual general grounds and several special grounds. Her bill of exceptions assigns error upon the overruling of the motion and upon exceptions pendente lite to the overruling of a demurrer to the petition.

Miss Delia Gunn, the plaintiff, testified:

"I am the owner of that note. . . I loaned Mr. Rhodes the sum of money stated in that note, $500, or I know he came for the money, and I let him have it. I did not extend the credit to Mr. Rhodes, but extended the credit to Mrs. Genevieve Griffith

Rhodes, and looked to her to pay it. The credit extended was extended to Mrs. Genevieve Griffith Rhodes in this case, and she has never paid me the money, and no one else has ever paid me that money. . . Mr. Joe Rhodes came to see me about getting the money, and I never talked with Mrs. Rhodes about it, but he was getting the money for her. She never came to see me about it at all. As a matter of fact, the thing that happened was: he came out to see me and told me he wanted to borrow this money, and I told him that I had the money and would lend it to him if he would get his wife to give me a note for it, and that was the understanding. I told him if he would get his wife to give him her note for the money I would let him have the money. He was going to use the money in his business, and his wife was connected with his business. I don't know that he explained to me at the time that the money was to be used in his business; I don't know as he did say anything about that, he only wanted to get the money. I told him if he would get his wife to give me her note for it, that I would let him have the money. Later he came back and brought the note himself, and he got the money, or the bond; you understand it was a Liberty bond. The bond was transferred to him, and later he said we were to get the bond back. He told me that later he would bring the bond back to me, and that was our understanding. This note I was taking was simply Mrs. Rhodes' note as a guarantee that Mr. Rhodes would bring me back my bond that he had borrowed from me, and we did not want to sell the bond; we wanted to hold on to that, as we thought it was a good investment and we drew interest on it, and Mr. Rhodes said he would return the bond. Later on we had trouble with him or litigation about the bond, because he had put that bond with some of his creditors, and it is true that I brought suit against the creditor to recover the bond. It is true that I tried to get the bond back from Mr. Rhodes, and at the time I claimed I loaned the bond to him, and that he was to return it to me, and it was my bond, and in that suit I did succeed in getting $150, and that $150 was a credit on the bond, and I claimed that this debt was made to secure or to cover the Liberty bond which Mr. Rhodes had borrowed from me, which he was to return to me. He has never given the bond back to me. Mr. Joe Rhodes has never given the bond back to me. He

is the man that got the bond from me. He is the man I looked to to send the bond back to me. He is the man I claimed got the bond from me at the time I brought this suit and the man paid back to me $150 on the bond suit. Mr. Beazley paid that to me. I succeeded in getting that on the claim that that bond belonged to me; that is the way Mr. Beazley got it. As I said, Mrs. Rhodes never talked with me about this matter at all; she never came to see us about it when Mr. Joe Rhodes got the bond. We knew that Joe's business was in bad shape, and were not willing to let the bond go, without his wife gave us her note, and that is what we explained when he came to me, and he told me that he would have his wife give me her note if I would let him have the bond. . . In delivering this bond to Mr. Rhodes, I delivered it to him for his wife, because we were not willing to let him have the bond; we knew that his business was in bad shape, and we did not like to let him have it. He did not ask to borrow the money for himself in his own name. He had asked me before that to let him have the money on the bonds, and I had refused to let him have it; I did refuse to let him have it alone, but I was willing to let his wife have the bond. Of course, we did not object to Joe's name being there, but we were not willing for Joe to have it without his wife. We did not object to his name being on the note. With reference to this note, it has been my note all the time since executed. I transferred this note to Mr. Chapman, as he thought he would take the business off of us; he felt like we ought not to lose it, and he thought he would try and collect it for us. I own this note now. . . I told Mr. Mitchell that I let Mr. Rhodes have this bond for Mrs. Rhodes, because I reckon she was connected with the business in some way. When he got the bond, I did not know how it was to be used by Mr. Rhodes. Joe did not explain to us how it was to be used; he just wanted to get the money. I did not understand that he himself was to return that bond, because he did not say he would; he said it would be returned to me. As I have told you, we would not loan the bond to Mr. Rhodes just by himself. When I brought the suit to recover the bond, I think it was brought against the one that got the bond, but I don't know as to that myself. When Mr. Rhodes came to me to get the money, I told him if he would get his wife to give me a note for it, I would let him have it; that was

the understanding. As to who I mean when I said 'I let her have it,' I mean I let Joe have the money because he came after it; of course, he was managing it for his wife."

*M. L. Felts,* for plaintiff in error.

*J. A. Mitchell,* contra.